# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:18-cv-00298-GCM

DOREEN SALAMONE,          )
                                         )
        Plaintiff,          )
                                         )
       v.                )
                                         )
CENTRAL PIEDMONT         )
COMMUNITY COLLEGE,     )
                                         )
        Defendant.    )
_____)

## BRIEF SUPPORTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This lawsuit exists because Doreen Salamone refused to accept direction from her supervisors. She resisted even the most mundane supervision with a barrage of frivolous accusations of discrimination and harassment. She abused the College's disability accommodation process in an effort to force the College to assign her a new supervisor.

Through it all, CPCC bent over backward to try to repair the working relationship. Twice, it successfully engaged in the interactive process and accommodated Plaintiff's disabilities. The College thoroughly investigated all of Plaintiff's accusations, even though none was ever substantiated. CPCC even engaged a private mediator and worked with Plaintiff and her attorney to resolve her

1

disputes. But the Plaintiff would never be satisfied. She wanted a new supervisor and that was that.

In the end, Plaintiff demanded a list of accommodations specifically tailored to be so burdensome that assigning her a new supervisor would be the College's only option. She refused to participate in the interactive process in good faith. Finally, she ignored a deadline despite being told specifically it would result in her termination. After years of trying to work things out with the Plaintiff, CPCC finally had no choice but to let her go.

There is no genuine issue as to any material fact. CPCC is entitled to judgment as a matter of law. The College requests summary judgment be entered in its favor and that this lawsuit be dismissed with prejudice.

## II.    UNDISPUTED FACTS

Plaintiff's educational background is in biology and medical technology. Prior to her employment at CPCC, Plaintiff worked in medical labs as a hematologist and medical technologist. From October 1996 until her termination in December 2017, Plaintiff worked as a full-time instructor in the College's Medical Laboratory Technology ("MLT") program. (Salamone dep. 11-17).

Plaintiff was a good instructor. She was generally well liked by her students and well regarded by her colleagues. Plaintiff's performance reviews throughout her employment were overall quite positive. (Natoli Affidavit ¶ 4, hereinafter "Natoli 4"). Although she consistently performed well in the classroom, Plaintiff's relationship with her supervisors began to deteriorate in 2014 with what eventually became known as the "refrigerator incident." (Salamone dep. 24).

2

*The refrigerator incident.*

Plaintiff reported to Karen Summers, Division Director, Medical Careers and Cosmetology ("Summers"). (Summers 3). In the spring of 2014, one of the refrigerators near Plaintiff's lab started making noise. Plaintiff described the noise as sounding "like a motorboat" and told Summers it was interfering with her ability to teach. (Salamone dep. 23). Summers decided to buy a new refrigerator when funds became available but kept the old one in service since it still worked and the MLT program needed refrigerator space for medical samples. (Summers 4).

In August 2014, with classes about to start, Plaintiff emptied out the noisy refrigerator and unplugged it. When she told Summers what she had done, Summers paused and replied, "Okay." Plaintiff interpreted this conversation as the moment "the breakdown began." Plaintiff perceived a "change in the friendliness" and felt her interactions with Summers became "more distant." However, Plaintiff cannot identify any example of this. (Salamone dep. 25-28). In fact, Summers was not upset that Plaintiff had unplugged the refrigerator. (Summers 5).

In early December 2014, Summers met with the Plaintiff to provide feedback on her classroom teaching and discuss other aspects of her job. Summers instructed Plaintiff to incorporate more classroom discussion into her teaching and to update a slide dated 1995 so it would not appear the College was using outdated teaching materials. (Summers 6). Summers told Plaintiff they would be going together to visit local medical clinics in order find more locations for students to gain clinical experience. (Salamone dep. 38-49).

Salamone perceived Summers as angry during this meeting based on "the tone of her voice and the persistence of asking." (Salamone dep. 49). In fact, Summers was not angry, but she could tell Plaintiff was not receptive to any of her suggestions for improving Plaintiff's performance. (Summers 7). Later that day, Plaintiff went to Human Resources ("HR") to complain about the "abusiveness of that meeting." (Salamone dep. 50). Plaintiff was directed to the College's Office for Institutional Equity, a subdivision of HR that handles discrimination and harassment, and made an appointment with its Director, Leon Matthews ("Matthews"). (Salamone dep. 51-52).

Plaintiff told Matthews she was incapable of complying with Summers' instructions because of a hearing disability. Matthews encouraged Plaintiff to submit a request for accommodations under the ADA. (Salamone dep. 52-53). On December 10, 2014, Plaintiff submitted to HR a Central Piedmont Community College Employee Reasonable Accommodation Request form citing an impairment of hearing loss. (Natoli Ex. 1).

### Plaintiff's first request for accommodations.

Kelly Natoli, CPCC's Executive Director Employee Relations, Recruitment, and Retention ("Natoli"), worked with Plaintiff and her supervisors to implement accommodations of Plaintiff's hearing disability. Prior to this, while some in the College knew Plaintiff favored one ear over the other, no one was aware her hearing loss significantly impacted her work. (Miller 3, Summers 8, Natoli 5). The College made several accommodations including purchasing a hearing aid system for Plaintiff

and installing microphone equipment and an auto-closing door hinge in Plaintiff's lab. (Natoli 6).

Despite the College's best efforts, it seemed Plaintiff was never satisfied. She consistently complained for over two years, up to the end of her employment, that CPCC's accommodation of her hearing disability was inadequate. (Natoli 7). It eventually became apparent that Plaintiff was not acting in good faith. Rather than working cooperatively to solve the problem, Plaintiff used the accommodation process as a means of thwarting her supervisors and as a springboard for frivolous accusations of discrimination and harassment. (Natoli 8). Although a full recounting of Plaintiff's oppositional behaviors is beyond the scope of this brief, her response to an ordinary email from Summers on January 13, 2016, provides an illustrative example.

By January 2016, the College had been actively engaged in attempting to accommodate Plaintiff's hearing disability for over a year. (Natoli 9). On January 5, 2016, Summers observed that Plaintiff was not engaged in a division training session. During the training, Plaintiff doodled, looked at her phone, and declined to participate in group activities. (Summers 9). On January 13, 2016, Summers emailed Plaintiff to say she was disappointed in Plaintiff's lack of participation and offered assistance for the future, stating, "If there is something that needs to be done to support your involvement for the next session please let me know. I would like you to fully participate in, and benefit from, the next training session in May." (Summers Ex. 1).

Rather than simply accept this innocuous coaching, Plaintiff fired off an email copied to Summers, Natoli, Paul Santos, Associate Vice President Human Resources ("Santos"), Kay Miller, Associate Dean of Allied Health Programs and Cosmetology ("Miller"), and Ruth Hedgpeth, Dean of Health, Human Services, Early Childhood Education and Cosmetology ("Hedgpeth"), strongly disagreeing with Summers' observation and stating, "If you will be holding this against me, I would like to know and will follow up as necessary." (Summers Ex. 1). Immediately thereafter, Plaintiff forwarded her email to Matthews, with whom she had recently met to complain about Summers, stating, "Just want to keep you informed. If Karen intends to hold this division meeting against me, I would find that to be in violation of the waiver of complaint I filed with you." (Matthews 4).

Over the next six weeks, Plaintiff bombarded Natoli with emails demanding numerous additional accommodations and promising additional complaints of discrimination and harassment if the divisional training was reflected in any way in her performance review. (Natoli Ex. 2). Natoli patiently worked through the details of Plaintiff's accommodation requests while trying to redirect Plaintiff toward positive engagement, stating:

> We're here to ensure you are not treated differently because of a disability. But all employees are expected to participate in training and to receive feedback – sometimes critical feedback – from their supervisors. Nothing in Karen's email suggests she is 'holding this against' you. She specifically asked if there was anything she could do to support your involvement in the next session. We are now discussing accommodations for that purpose. Please try to engage in this process, including with Karen, as cooperative and not adversarial.
> (Natoli Ex. 2 p. 01110).

6

Plaintiff was not having that. She responded the next day to assure Natoli she had already reported this matter to Matthews and updated a pending EEOC charge. On this and several other occasions, Plaintiff demanded a definition of the word "participation" and a detailed explanation of why Summers deemed her participation inadequate. (Natoli Ex. 2 p. 01111).

Plaintiff made is abundantly clear she intended to request specific ADA accommodations to counter whatever Summers might say, stating, "I'd like to know exactly specifically what areas [Summers] claims I was lacking in to warrant the 'I was disappointed' email. Until I know that, I will not know what accommodations will be necessary." (Natoli Ex. 2 p. 01117).

The next day, Plaintiff reiterated her intention, stating, "As far as the accommodations, I will have to get a response from [Summers] as to what areas she claims I was deficient in. Once I have that information, I will have a better idea of what accommodations will be needed to meet the expectations that appear to vary without notice. I will get back to you once I get a clear explanation from [Summers]." (Natoli Ex. 2 p. 01119).

On or about February 15, 2016, Summers informed Plaintiff that she had observed Plaintiff doodling and checking her phone during the training. (Salamone dep. 145-147). Summers interpreted these behaviors and others as a lack of engagement. (Summers 9). The next day, Plaintiff emailed Natoli and requested as reasonable accommodations that she be allowed to doodle and check her phone in all meetings. (Natoli Ex. 2 p. 01120).

The discussions about the division training were, from the College's perspective, typical of Plaintiff's employment from the refrigerator incident until her eventual termination, in that:

- The underlying issue was minor. Plaintiff was not facing any disciplinary action. She had only received a gentle coaching email from her boss. Plaintiff's concern, at most, was that Summers might reference in the matter in an upcoming performance review, but as shown herein, Plaintiff's performance reviews were always good.
- Plaintiff's communications were laced with accusations of discrimination, harassment, and threats of legal action. The College never substantiated any of these complaints.
- Plaintiff's issues consumed an inordinate amount of time. Natoli had to respond to non-stop complaints and requests for additional accommodations. Matthews had to investigate numerous unfounded accusations. Summers could not give the simplest instruction without facing a brick wall of opposition.
- Plaintiff seemed far more interested in perpetuating the dispute than resolving it.
- Plaintiff requested accommodations to dictate the terms of her employment, not as part of a collaborative effort to help her perform the essential functions of her job. The College concluded Plaintiff was not participating in the interactive process in good faith.
  (Summers 11, Miller 4, Natoli 11, Matthews 5, Santos 4).

On August 15, 2016, eight months after the division meeting, Plaintiff was still sending lengthy emails complaining about the same issues. Natoli told her, "You seem determined not to be satisfied with our efforts. Your persistent complaints about minor issues you could easily resolve on your own are placing an undue burden on our resources and time." (Natoli Ex. 2 p. 01726).

### Plaintiff's second request for accommodations.

On September 1, 2015, with the controversy regarding Plaintiff's hearing accommodations ongoing, Plaintiff submitted a request for accommodation of an orthopedic and neuromuscular disability limiting her ability to walk, bend, and

negotiate stairways. (Natoli Ex. 3). The College again participated in an interactive process including several emails and a meeting on September 16, 2015, with Plaintiff, Summers, Miller, and Natoli. The College agreed to provide several accommodations including a key to the office kitchen, a seat cushion, a reacher tool, storage bins, and a cart. (Natoli 13). Plaintiff acknowledges she received all the accommodations she requested and that they were effective. (Salamone dep. 128-131).

Nevertheless, Plaintiff persisted in filing complaints of discrimination, harassment, and retaliation, both internally and externally. In these complaints, Plaintiff consistently, sometimes expressly, conflated Miller's and Summers' ordinary efforts to manage the MLT program with Plaintiff's relentless and unfounded accusations.

For example, in November 2015, Plaintiff filed a complaint with HR alleging retaliation for her reasonable accommodation requests. (Santos 5). In a meeting with Santos on November 6, 2015, Plaintiff went back through all the history of her dispute from a year before, including the refrigerator incident and the course materials dated 1995. (Santos 6).

At that time, Miller and Summers were hoping to cross-train MLT employees so the program could carry on smoothly if any individual were to leave. (Summers 12). Plaintiff strongly objected to cross-training and told Santos, "I am unwilling and uncompromising in my position regarding accepting change Karen and Kay are proposing. I will not accept what they want." (Santos 7).

Several days later, Plaintiff submitted to Santos a 46-page document titled "Summary of (Doreen Salamone's) Complaint received 11/11/15." Santos handled this issue because Matthews, who normally would do it, was out on paternity leave. (Santos 5). Plaintiff's summary went all the way back to the refrigerator incident, including several photographs of refrigerators, lengthy narratives, and dozens of emails tracing the history of Plaintiff's ongoing dispute. It occurred to Santos that if Plaintiff devoted a fraction of the effort she had spent on the summary to doing what her supervisors asked, no one would have anything to complain about. (Santos 10).

Santos investigated Plaintiff's allegations, including speaking with several witnesses and asking clarifying questions via email. (Santos 11). He concluded Plaintiff's allegations were unsubstantiated and informed her via letter dated November 20, 2015. (Santos Ex. 4). This was just one of numerous unfounded complaints and oppositional behaviors the College was required to deal with during the final years of Plaintiff's employment.

### *EEOC charges.*

Plaintiff filed three EEOC charges against the College. (Matthews 6). She filed the first one on November 23, 2015, three days after Paul Santos notified her that her complaints to HR were unsubstantiated. (Matthews 7). Plaintiff filed her second EEOC charge on June 14, 2017, alleging unspecified failure to provide disability accommodations. (Matthews 8). Plaintiff filed her final EEOC charge January 2, 2018, based on her discharge and alleging failure to provide ADA accommodations. (Matthews 9). All three charges were dismissed with no cause. (Matthews 10). The

10

College's position statements on the first and third charges (EEOC did not request a position statement on the second) set forth the College's position substantially as it is presented here, with some additional detail. (Matthews Ex. 2, Ex. 3).

### Complaints to CPCC's Office for Institutional Equity.

In addition to assisting in preparing the College's response to Plaintiff's EEOC charges, CPCC's Office for Institutional Equity was frequently in touch with Plaintiff between January 2015 and her eventual discharge. (Matthews 11). This included not just formal complaints of discrimination, harassment, and retaliation, but also day to day questions and emails that did not rise to the level of a formal investigation. Matthews estimates he personally met with Plaintiff at least 12 times. (Matthews 12). Each time Plaintiff filed a complaint, Matthews investigated by speaking to witnesses and asking clarifying questions via email. In all of his investigations, both formal and informal, Matthews never substantiated a single allegation of discrimination, harassment, or retaliation. (Matthews 13).

Plaintiff filed her first complaint with Institutional Equity, referenced as a "waiver of formal complaint," on January 14, 2015. While generally referencing the refrigerator incident and surrounding issues, Plaintiff specifically requested that a neutral third person be present for all meetings between Plaintiff and Summers. Matthews 14, Ex. 4). This specific request would come up again and again throughout the ongoing dispute. Plaintiff told Matthews in their initial meeting that she would not tell him everything because she intended to "save the big guns for the jury." (Matthews 14).

11

Plaintiff complained to Institutional Equity in March 2015 that Summers was retaliating against her by making a minor change in the number of clinical visits on her scheduled workload. (Matthews 15). Plaintiff stated at the time she was sure this was done as retaliation (Matthews Ex. 5). However, she now acknowledges the only reason she believed that is because one event preceded the other. Plaintiff now says this issue was not "a big deal" but at the time it required Matthews to conduct an investigation. (Salamone dep. 81-82). Plaintiff's allegations of retaliation were not substantiated. (Matthews 13).

Matthews met with Plaintiff on September 2, 2016, and yet again went through the entire history beginning with the refrigerator incident (now two years prior), the slide from 1995, attempted accommodations, and allegations of retaliation. (Matthews 16, Ex. 6). Again, Plaintiff's allegations were not substantiated, and Matthews concluded his investigation on September 23, 2016. (Matthews 17, Ex. 7).

In early August 2017, Plaintiff filed a complaint with Institutional Equity alleging retaliation for filing an EEOC charge. This time, the alleged retaliation was Summers' asking Plaintiff to perform tasks she felt she did not have time to do. (Matthews 18). Once again, Matthews investigated and determined Plaintiff's allegations were unsubstantiated. (Matthew 19, Ex. 8).

### *Rebuttals to performance reviews.*

Nowhere is Plaintiff's complete refusal to accept any direction from her supervisors more clear than in the rebuttals she filed to her Performance Assessment and Professional Development Plans ("PDPs") in 2015 and 2016. (Natoli 14).

Although Plaintiff's overall rating was "advanced" in both years (correlating to higher than a 4 out of 5), Plaintiff prepared lengthy narrative responses both years attributing anything less than an exemplary rating to unfairness, discrimination, and retaliation. (Natoli Ex. 4, Ex. 5).

To this day, Plaintiff is unwilling to acknowledge any aspect of performance that could have been improved upon. In reference to a PDP planning meet with Miller and Summers in October 2015, Plaintiff testified, "At that time I didn't know of any area that I needed improvement on." (Salamone dep. 131-133). Plaintiff further testified she could not think of a single suggestion for improvement Summers ever made that she agreed with, nor a single criticism she considered fair. (Salamone dep. 150-163). This attitude comes through loud and clear in Plaintiff's rebuttals.

The documents speak for themselves. Of particular note is that Plaintiff expressly accuses her supervisors of harassment and retaliation in the beginning, middle, and end of each rebuttal document. (Natoli Ex. 4, Ex. 5). Summers and Miller concluded from these rebuttals that Plaintiff was not receptive to any guidance or direction. (Summers 13, Miller 5). Santos and Natoli concluded from these rebuttals that Plaintiff's complaints of discrimination and harassment were not made in good faith. (Natoli 17, Santos 13).

Plaintiff's strenuous objection to the PDPs was gratuitous considering she suffered no negative consequence from them. The PDPs were very good overall, and generally complimentary of Plaintiff's performance. (Natoli 18, Ex. 4, Ex. 5). But Plaintiff's perspective was so warped she interpreted even the positive ratings as a

retaliatory plot, stating, "I am sure the only reason I got a proficient in that category was to divert the EEOC attention during the investigative process." (Salamone dep. 162-163). (Natoli Ex. 5).

### *Refusal to complete a simple task.*

In January 2017, Summers instructed Plaintiff to copy course materials onto a flash drive as part of a cross-training initiative so they could be used by others in the MLT program. Summers thought it would only take an hour or two, but gave Plaintiff a deadline of March 1, 2017, leaving her the entire month of February to get it done. Plaintiff immediately resisted. (Summers 14, Salamone dep. 176-188). Although Plaintiff testified it eventually took her 2-3 days to complete this task, at the time she felt she was so overwhelmed by her workload that she could not get it done within a month. (Salamone dep. 178). As always, Plaintiff attributed something nefarious to this simple task and reasonable deadline, stating in an email to Hedgpeth over three weeks before the deadline:

> I would like an explanation of the urgency and what negative impact an extension would have. Please let me know if you would reconsider or if I should move forward with meeting with Dr. Bouton or Leon Matthews as I feel this deadline might have something to do with the discrimination/harassment/retaliation complaints I have made and are still being processed through attorneys. This deadline appears to be unfounded and appears to be in retaliation to my continued complaints against the college regarding my disability.
> (Salamone dep. 181-182, Ex. 7).

In fact, Plaintiff did not meet the deadline after all. Prior to March 1, Plaintiff went out on FMLA leave for post-traumatic stress disorder, anxiety, and depression. (Salamone dep. 180-188).

*The College proposes mediation.*

In late November 2016, the College received a letter from an attorney representing Plaintiff, once again containing a lengthy narrative of Plaintiff's grievances going all the way back to the refrigerator incident. (Santos 14, Ex. 5). Undersigned counsel responded on December 9, 2016, stating, "[W]e welcome your letter as an opportunity to make real progress toward resolving what seems to us an unfortunate and unnecessary dispute." (Santos 15, Ex. 6). Over the next several weeks, the discussion of accommodations often included the parties respective counsel. Plaintiff repeatedly suggested through counsel that she and/or the MLT program should be assigned to a different supervisor. (Santos 16).

Natoli, Summers, and Miller considered the possibility of moving Plaintiff and/or the MLT program to work under a different supervisor but ultimately determined it was not workable because it would fundamentally alter the operation of the division. (Natoli 19, Miller 6, Summers 15). It also was appropriate for the MLT program to be supervised by Summers because her professional background is in MLT. (Summers 15). The College clearly communicated this decision to Plaintiff through counsel but continued talking in the hope of repairing the relationship between Plaintiff and her current supervisors. (Santos 17).

The College proposed a mediation and offered to pay for it. The College hoped to convince Plaintiff that no one was out to get her, and to definitively agree upon accommodations so there would be no reason for ongoing conflict. (Santos 18, Natoli

20). As part of the process, Plaintiff and representatives of the College met separately with the mediator in preparation for a joint session. In fact, two joint mediation sessions were held in May 2017. Unfortunately, the mediation was unsuccessful. Miller, Summers, and Natoli were open-minded and participated in good faith, but they did not perceive Plaintiff as willing to compromise in any way on her demand for a new supervisor. (Natoli 21, Summers 16, Miller 7).

### Third request for accommodations.

On August 2, 2017, Plaintiff met with Natoli to request, yet again, assignment to a new supervisor. She also asked to have a support person present for meetings with Miller and Summers. (Natoli 22). Natoli reminded Plaintiff that the request for a new supervisor had already been discussed extensively and denied. Plaintiff responded, "If you can't give me a new supervisor, wait until you see the next list of requests that I give you." Natoli interpreted this as meaning Plaintiff intended to propose an extremely burdensome set of accommodation requests. (Natoli 23).

Natoli discussed this conversation with Santos, who suggested Plaintiff fill out an accommodation request form. (Natoli 24). ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ When she handed in the form, Plaintiff and Natoli again discussed Plaintiff's proposed accommodations. (Natoli 25, Ex. 6).

Plaintiff requested that, unlike the previous times the College had engaged in the interactive process, this time she did not want to participate in any meetings with Miller or Summers. The College agreed and from that point forward discussed the

16

proposed accommodations without requiring Plaintiff to attend any meeting. (Natoli 26).

████████████████████████████████████████████ ████████████

████████████████████████████████████████████ The form contained seven proposed accommodations including, among other things, "Assign the employee to a different supervisor independent of influence from Kay Miller," and, "Minimal interaction with the people that trigger the PTSD episodes." (Natoli Ex. 6).

Natoli reviewed the proposed accommodations with Santos. Some of the proposals were straightforward, such as allowing Plaintiff to leave campus for counseling. Others, such as the request for a support animal, might be workable depending on the details. However, Natoli and Santos were concerned about the request for a new supervisor because this had already been discussed and length and rejected. (Natoli 27, Santos 19). Santos reminded Plaintiff this request had already been denied and instructed her to stop bringing it up. (Santos 20).

Since it was also difficult to tell from the form what "minimal interaction" with her supervisors would look like, or what the role of a "support person" would be, Natoli and Santos decided to seek clarification from Johnston. (Santos 21, Natoli 28). With Plaintiff's authorization, Santos sent Johnston a list of questions. (Santos 22, Ex. 7). On or about September 8, 2017, Johnston responded in writing. (Santos 23, Ex. 8). In response to the College's request for clarification of "support person," Johnston stated:

Due to the denial of the recommendation for another supervisor, monitored interactions with Karen Summers and Kay Miller is a critical accommodation that will aid with DS's ability to function and perform effectively. In light of the nature of PTSD and the need to facilitate a sense of safety and security, the support person should be one of DS's choosing and may vary based on the availability of approved parties.

**Recommendation**: DS may choose a colleague within the college (e.g. a co-worker), someone from another department, or any other employee of CPCC that she deems appropriate.

**Recommendation**: DS may also choose to bring in an outside party. Should she choose to do so, the outside party will sign a confidentiality agreement.
(Santos Ex. 8).

In response to the College's request for clarification of "minimal interaction," Johnston responded:

As previously stated, minimal interaction would entail communication via email or in writing, which should be filtered through the program chair, along with communication via phone in urgent, time-sensitive cases only. At no time, should DS's supervisors interact with her in person unless the support person of DS's choosing or other colleagues are present. This includes making "small talk," such as "hello" or "goodbye."
(Santos Ex. 8).

Natoli discussed the proposed accommodations with Miller. They agreed the "support person" would be extremely inconvenient and restrictive, as well as requiring other employees to be pulled away from their own work. The proposal of an outside support person was unworkable because it was unnecessarily intrusive and would impose an administrative burden of dealing with issues of student privacy. Miller and Natoli agreed that if Plaintiff could not even say "hello" or "goodbye" to

her supervisors, she was effectively saying she could not work with them at all. (Natoli 29, Summers 16).

Natoli and Santos concluded that Plaintiff was not engaged in good faith in the interactive process. Rather, they believed she intentionally submitted unrealistic accommodation requests in the hope of forcing the College to assign her to a new supervisor. They also were concerned about the College's potential liability for bringing Plaintiff back into the MLT program, considering it was on notice that even minimal interaction with Miller and Summers would trigger symptoms of PTSD. It was clear to Santos and Natoli that Plaintiff could not continue in her job in the MLT program. (Natoli 30, Santos 24).

Thus, in order to allow Plaintiff to remain employed, the College offered the accommodation of reassignment to another position. (Santos 25, Natoli 31). Given Plaintiff's longstanding recalcitrance, legal threats, and refusal to meet deadlines, Santos communicated her options clearly and in writing. On September 12, 2017, Santos sent Plaintiff a letter offering: 1) reassignment; 2) short-term disability; or 3) resignation of employment. Santos gave Plaintiff a deadline of 5:00 p.m. September 15, 2017 to notify the College of her intentions. Santos specifically stated that if Plaintiff failed to meet this deadline, she would be placed on administrative leave and recommended for termination of employment. (Santos 26, Ex. 9). The next day, Santos followed up via email with additional positions Plaintiff could consider for reassignment. (Santos 27, Ex. 10).

19

Plaintiff asked for more time to consider her options, which Santos denied. (Santos 28). Rather than meeting the deadline, on September 14, 2017, Plaintiff went out on FMLA leave with an expected date of return to work on October 2, 2017. (Santos 29). On September 26, 2017, Santos sent Plaintiff a letter reiterating her three options and giving her a deadline of 5:00 p.m. on September 29, 2107 to state her intentions. (Santos 30, Ex. 11).

Plaintiff notified the College she intended to return to work on October 9, 2017, but failed to choose any of the three options. (Santos 31). Santos sent Plaintiff yet another letter dated September 28, 2017, this time imposing a deadline of October 2, 2017 for Plaintiff to state her intentions. Santos specifically stated, "If you do not communicate your choice by this deadline, then you will be placed on paid administrative leave effective 10/3/17 and recommended for termination." (Santos 32, Ex. 12).

Plaintiff never chose any of the three options. (Santos 33). On October 3, 2017, Santos notified Summers, Miller, and Hedgpeth he recommended termination of Plaintiff's employment. They agreed and sent a memorandum up the chain of command recommending termination of employment. (Santos 34, Ex. 13). The recommendation was upheld at every level of review provided by the College's due process policy and Plaintiff's employment was terminated December 5, 2017. (Santos 35).

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A fact is material only if it might affect the outcome of the suit under governing law. *Id.*

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Id. at 322 n.3.* The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id. at 324.* Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248;* accord *Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).*

## B.    Americans With Disabilities Act ("ADA")

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a).* To prove a failure to accommodate claim, a plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 579 (4th Cir. 2015)* (quoting *Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013)).*

### 1.    *Plaintiff's inability to work with her supervisors is not a disability.*

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *42 U.S.C. § 12102(1).* Major life activities include, inter alia, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id. § 12102(2)(A).*

Plaintiff evidences a diagnosis of PTSD, a recognized mental impairment which could substantially limit major life activities. However, to be substantially limited in her ability to work, Plaintiff must show her mental impairment precluded her "from more than one type of job, a specialized job, or a particular job of choice."

22

*Pollard v. High's of Balt., Inc., 281 F.3d 462, 471 (4th Cir. 2002)* (quoting *Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*). She must show she cannot work "in a broad range of jobs." *Id.* "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Metro v. Lewis Gale Clinic, No. 7:01CV00936, 2002 U.S. Dist. LEXIS 29461, 2002 WL 32833260, *3 (W.D.Va. Apr. 26, 2002)* (quoting *29 C.F.R. § 1630.2(j)(3)(i) (2016)*).

The evidence establishes, at most, that Plaintiff is unable to work with Miller and Summers. In *Rhodes v. Comcast Cable Communications Management, LLC*, 2016 U.S. *Dist. LEXIS 108898 (D.Md. August 17, 2016)*, the Court held an ADA plaintiff failed to demonstrate she was disabled under the ADA where, as here, the evidence demonstrated merely that she was unable to work with a particular group of individuals, not that she was "generally foreclosed from jobs utilizing her skills." *Id.*, quoting *Rhodes v. FDIC, 257 F.3d 373, 388 (4th Cir. 2001)*.

Similarly, in *Howell v. Holland, 2014 U.S. Dist. LEXIS 182306 (D.S.C. August 12, 2014)*, the plaintiff, a heart and lung machine operator, requested a modified schedule as a reasonable accommodation so he would never have to work with a particular surgeon. The Court observed, "It strains credulity to conclude that Plaintiff substantially limited in the major life activity of working simply because he cannot work with Dr. Holland." *Id, at 19-20*.

The Court in *Howell* cited several other cases holding the mere inability to get along with one's supervisor does not qualify as a disability under the ADA. See

Case 3:18-cv-00298-GCM   Document 12-39   Filed 04/12/19   Page 24 of 31

*Schneiker v. Fortis Insurance Company, 200 F.3d 1055, 1062 (7th Cir. 2000)* (personality conflict with supervisor does not establish disability even where supervisor caused employee's depression); *Weiler v. Household Finance Corp., 101 F.3d 519, 525 (7th Cir. 1996)* (employee was not disabled under the ADA where she could not work only with a certain supervisor because "if she can do the same job for another supervisor, she can do the job, and does not qualify under the ADA"); *Hatfield v. Quantum Chemical Corp., 920 Fed. Supp. 108, 110 (S.D. Tx 1996)* (not being able to work with supervisor did not substantially limit major life activity); *Flynt v. Biogen Idec, Inc., No. 3:11-cv-22-HTW-LRA, 2012 U.S. Dist. LEXIS 141494 (S.D. Miss. Sept. 30, 2012)* (the inability to work with a specific person does not establish a disability nor does an employer have a duty under the ADA to accommodate such a restriction).

As the District Court for the Southern District of Mississippi noted, the ADAAA (ADA Amendments Act), which amended the ADA in 2008, did not change the definition of disability or make all mental or physical impairments disabilities:

> Even under the amendments, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities." *42 U.S.C. § 12102(1)*. Not being able to work with Richards, as a matter of law, does not substantially limit any major life activity of working. . . The conflicts plaintiff had with Richards [his supervisor], even if they caused depression and stress, simply cannot establish disability under the law.

*Flynt, 2012 U.S. Dist. LEXIS 141494* (emphasis in original). Simply put, Plaintiff's inability to work with Summers and Miller is insufficient to show that she is substantially limited in any major life activity. Thus, Plaintiff fails to show she is disabled within the meaning of the ADA.

Case 3:18-cv-00298-GCM   Document 12-39   Filed 04/12/19   Page 25 of 31

## 2. Plaintiff was not a "qualified individual" because working with her supervisors was an essential function of her job.

Even assuming *arguendo* that Plaintiff's PTSD qualified as a disability, courts have held that being able to work with one's supervisor or co-employee is an essential job function and the inability of a plaintiff to perform such an essential job function means the plaintiff is not a "qualified individual" under the ADA. See *Gaul v. Lucent Technologies, 134 F.3d 576, 581 (3rd Cir. 1998)* (refusal to work with co employee that allegedly caused the plaintiff stress meant the plaintiff was not a "qualified" individual under the ADA); *Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2nd Cit. 1996)* (essential function of the plaintiff's job was to work under her assigned supervisor); *Prichard v. Dominguez, 2006 U.S. Dist. LEXIS 46607, (N.D. Fla. June 29, 2006)* (the plaintiff was not a "qualified individual with a disability" when she refused to work with the Major which was an essential function of her job as Deputy Director of Public Affairs).

The evidence here establishes Plaintiff could not tolerate any contact with her supervisors, not even to exchange pleasantries. Since she was completely unable to work with Summers and Miller, she was not qualified for her position and cannot obtain relief under the ADA.

## 3. The College engaged in the interactive process in good faith, but the Plaintiff did not.

To establish a prima facie case in an ADA failure-to accommodate claim, a plaintiff must prove: (1) she has a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with a reasonable accommodation, she could

perform the essential functions of the position; and (4) the employer refused to make such an accommodation. *Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).*

The failure-to-accommodate inquiry generally proceeds in two steps: (1) was the specific accommodation that the disabled employee requested reasonable? and (2) if the employer granted the reasonable accommodation, could the disabled employee perform the essential functions of the job? *Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 580-81 (4th Cir. 2015).*

The ADA contemplates an open, interactive process between the employer and employee to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome the limitations." *29 C.F.R. § 1630.2(o)(3); EEOC v. Kohl's Dep't Stores. Inc., 774 F.3d 127, 132-33 (1st Cir. 2014); Wilson, 717 F.3d at 346-47.* The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." *Kohl's Dep't Stores, Inc., 774 F.3d at 132.*

During "the interactive process, an employer may request and require that the employee provide sufficient medical documentation." *Gilreath v. Cumberland Cty. Bd. of Educ., 2014 U.S. Dist. LEXIS 105904\* (E.D.N.C. July 31, 2014)* (unpublished). Such medical documentation allows the employer to determine the precise nature and extent of the employee's restriction due to a disability under the ADA and to assess potential reasonable accommodations. *Id.*

The interactive process requires bilateral cooperation, open communication, and good faith. *Kohl's Dep't Stores, Inc., 774 F.3d at 132.* "If an employer engages in the interactive process with the employee in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations." *Id.*

The Fourth Circuit has emphasized:

> [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011)* (unpublished), accord, *Kohl's Dep't Stores. Inc., 774 F.3d at 132-34; Hoppe v. Lewis Univ., 692 F.3d 833, 840-41 (7th Cir. 2012); Griffin v. United Parcel Serv. Inc., 661 F.3d 216, 224-25 (5th Cir. 2011); EEOC v. Agro Distribution, LLC, 555 F.3d 462, 471-72 (5th Cir. 2009); Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 734-40 (5th Cir. 1999).*

The evidence establishes Plaintiff abused the interactive process in bad faith, using it primarily as a weapon against her supervisors. Plaintiff sought accommodations to help her avoid performing her assigned duties rather than to assist with them. For this reason, Plaintiff's ADA claims should be dismissed.

**4.     *Plaintiff's requested accommodations would have imposed an undue hardship. The College offered a reasonable alternative of reassignment, which Plaintiff refused.***

The evidence establishes the only accommodation Plaintiff would accept was assignment to a new supervisor. The restrictive conditions she sought to impose on her interactions with Summers and Miller were calculated to be unworkable and impossible. However, there was no impediment to Plaintiff's reassignment to another position. The College offered this reasonable accommodation, and Plaintiff refused it.

The ADA does not require an employer to make an accommodation if that accommodation would impose an undue hardship under the particular circumstances of the case. *Reyazuddin v. Montgomery County, 789 F.3d 407 (4th Cir. 2015)*. An employee is not entitled to the accommodation of her choice. See *Crawford v. Union Carbide Corp., 202 Fed 3d 257 (4th Cir. 1999)*; *Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir.1997)* ("[a] qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation").

While an employee's preference for one accommodation over another may be taken into account, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *29 C.F.R. § 1630.9 Appendix, Interpretive Guidance*. Indeed, the accommodation chosen by the employer need not be the "best" accommodation possible, "so long as it is sufficient to meet the job-related needs of the individual being accommodated." *Id.*;

see also *Corrigan v. Perry, No. 97-1511, 1998 U.S. App. LEXIS 5859 (4th Cir. March 24, 1998)*.

In *Wiggins v. Davita Tidewater LLC, 451 Fed. Supp. 2d 789, 799 (E.D. Va. 2006)*, the Court held it is not a reasonable accommodation to require the employer to transfer an employee away from a supervisor even if the supervisor is the individual who allegedly created a stressful environment for the employee. See also, *Gaul v. AT&T Inc., 955 Fed. Supp. 346, 352-353 (D.N.J. 1997)* (finding that an employee's request for a transfer away from a particular supervisor was unreasonable and imposed an undue burden on the employer); *E.E.O.C., Revised Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act (Oct. 2002)* ("Question 33: Does an employer have to change a person's supervisor as a form of reasonable accommodation? Answer: No. An employer does not have to provide an employee with a new supervisor as a reasonable accommodation").

Plaintiff attempted to use the ADA to choose her supervisor. The protections of the ADA are no so far-reaching. See *Weiler v. Household Finance Corp., 101 F.3d 519 (7th Cir. 1996)* ("The ADA does not require [the employer] to transfer [plaintiff] to work for a supervisor other than [his current supervisor] . . . [Plaintiff]'s solution is that she return to work under a different supervisor. But that decision remains with the employer. In essence, [Plaintiff] asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility").

Case 3:18-cv-00298-GCM   Document 12-39   Filed 04/12/19   Page 30 of 31

Plaintiff dictated the terms of her employment for over two years with relative success, but in the end, she overplayed her hand. The ADA does not require the College to assign a new supervisor, but it offered a reasonable alternative. Plaintiff's refusal to be reasonable forecloses relief under the ADA.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff's claims should be dismissed and this lawsuit should be dismissed with prejudice.

This 12 day of April, 2019.


s/ Stephen J. Dunn
NC State Bar No. 25796
VAN HOY, REUTLINGER, ADAMS & DUNN
737 East Boulevard
Charlotte, NC 28203
Telephone:  (704) 375-6022
Fax:          (704) 375-6024
Email:        steve.dunn@vradlaw.com
*Attorney for the Defendant*


**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing on the parties in this action by filing it with the electronic filing system of the United States District Court for the Western District of North Carolina, which shall cause it to be delivered to counsel of record as follows:

> Kirk J. Angel, Esq.
> kirk@mailalf.com

This 12 day of April, 2019.


/s/ Stephen J. Dunn